## SMITH v. WELLS, FARGO & CO.

### (Circuit Court, S. D. California. August 28, 1899.)

### No. 754.

RAILROADS—CONTRACT WITH EXPRESS COMPANY—CONSTRUCTION AND EFFECT.
A railroad company entered into a contract by which it undertook to grant to an express company, for a term of five years, exclusive express privileges and facilities upon the entire railroad system of which its line formed a part, in consideration of lump payments to be made to it by the express company. The other roads of the system approved the contract, and an agreement was made—to which the express company was not a party—for division of the payments between them. The contracting railroad and others of the system passed into the hands of receivers, who continued the contract; but on the sale of such road in foreclosure proceedings the purchaser refused to assume responsibility for further performance of the contract by the other roads, and made a new contract. *Held*, that the original contract was entire, and was terminated by such action as to all the roads concerned, and that the receiver of one of such roads, who continued thereafter to furnish facilities and to render service to the express company, but with knowledge of the facts, and that such service was not claimed under the contract, could not maintain an action thereon against the express company to recover payment on the basis of the amount allotted to it for similar service in the distribution of payments made under the contract.

This was an action to recover a balance alleged to be due under a contract for services rendered and facilities furnished by the railroad of which plaintiff was receiver to defendant express company. Heard on demurrer to complaint.

C. N. Sterry, for plaintiff.

Graves, O'Melveny & Shankland and E. S. Pillsbury, for defendant.

ROSS, Circuit Judge. This case is submitted for decision upon a demurrer to the complaint, as amended by two stipulations entered into between the respective parties. The case has been so submitted, as stated by counsel, for the purpose of presenting the entire merits of the cause, and obtaining an adjudication thereon without further proceedings. As thus presented, the facts hereinafter stated appear.

On the 1st day of December, 1892, Wells, Fargo & Co. (hereinafter referred to, for convenience, as the "Express Company") and the Atchison, Topeka & Santa Fé Railroad Company (hereinafter referred to, for convenience, as the "Atchison Company") entered into a contract, in writing, which recited that whereas the Atchison Company then owned, operated, or controlled a large and extensive system of railways, and, by certain leases, contracts, agreements, understandings, and arrangements, constituted a part of a still larger system of railways, made up of its own lines and the lines of the St. Louis & San Francisco Railway Company, the Gulf, Colorado & Santa Fé Railway Company, the Atlantic & Pacific Railroad Company, the

Southern California Railway Company, the Colorado Midland Railway Company, and the Sonora Railway Company (the line of the latter company being in the state of Sonora, republic of Mexico), which said system was commonly known as the "Atchison, Topeka & Santa Fé System," or "Santa Fé Route," and that whereas the Express Company was then engaged in carrying on the express business in various states and territories of the United States and in foreign countries, and in operating an extensive system of express business on and over various railway, stage, and steamship lines in the United States and foreign countries, including the line from New York and other points on the Atlantic coast to San Francisco and other points on the Pacific coast, and to Chicago, St. Louis, Galveston, El Paso, Denver, Los Angeles, San Diego, and other important cities and towns of the United States, therefore, in consideration of the premises, and of the covenants, promises, and agreements therein made by the Atchison Company and the Express Company, and of the benefits to be secured, services to be performed, rights and facilities acquired, and payments to be made as therein set forth, mutually covenanted and agreed, among other things, as follows, to wit:

By article 1 of the contract the Atchison Company agreed to provide and cause to be provided on each of its regular daily passenger trains, and on each of the regular daily passenger trains of the other above-named railroad companies, sufficient facilities of the kind customarily furnished to express companies by railroad companies for the transportation of all freight and express matter which might be tendered by the Express Company to the railroad company, or to either or any of the railroad companies named, at any station at which such passenger trains may stop, and to receive and transport such freight and express matter upon such passenger trains leaving such station next following said tender, and to carry and deliver the same without detention.

By article 2 the Express Company agreed to pay the Atchison Company for the said facilities by the first article agreed to be furnished by the Atchison Company 55 per cent. of the entire gross earnings, of all kinds and character whatsoever, including earnings on money orders received by it in the operation of the express business, upon all of the said named lines of railroad, taken as a whole, as they then existed; and the Express Company, upon the consideration stated, further stipulated and guarantied that the said 55 per cent. of the gross earnings to be paid to the Atchison Company should amount to not less than $1,450,000 per annum, upon all of the said lines of the said different railway companies, taken together as a whole, as they then existed.

By article 3 the Express Company further agreed that it would make payments on account of the contract as follows:   On the 1st day of each calendar month, during the existence of the contract, it would pay to the Atchison Company the sum of $120,833.33, being one-twelfth of the said sum of $1,450,000 so guarantied as aforesaid, and would thereafter, without unreasonable delay, ascertain and adjust the earnings of said month, and, as soon as ascertained and adjusted, would pay over promptly any balance that might be due the Atchison Company under the contract for and on account of the earn-

ings for said month, and that if, upon the adjustment for any one month, it should be found that 55 per cent. of the gross earnings was less than the sum for said month paid under the guaranty, then the difference between the said 55 per cent. and the amount paid under the guaranty should be deducted from the amount found due the Atchison Company above the guaranty for the next month, and so on from month to month during the year. Article 3 of the contract further provided that at the end of each calendar year, during the existence of the contract, an adjustment should be made of all the earnings under the contract for the said year, and of payments made by the Express Company to the Atchison Company, and that, if any sum should be found due on the 55 per cent. of the gross earnings upon said final adjustment for said year, the sum so found due, if anything, should be paid by the Express Company to the Atchison Company as soon as such sum should be ascertained.

By article 4 it was provided that, for the purpose of settlement and adjustment as provided for in the contract, the Express Company should report monthly to the Atchison Company the express traffic carried over the several lines of railroad embraced in the contract, and the gross earnings therefrom, in such form as might be agreed upon between the parties to the contract, and further agreed that it would furnish to the Atchison Company such other statements, reports, and information as the Atchison Company might reasonably require, regarding the traffic covered by the agreement and the rates and earnings thereunder, and that the Atchison Company should at any and all times have access to the books and papers of the Express Company for the purpose of verifying the statements, records, and information furnished by the Express Company.

By article 5 the Express Company further agreed that it would not, without the consent of the Atchison Company, charge less than 1½ current railroad tariff freight rates on any matter from or to any intermediate points exclusive to the lines covered by the contract, and, further, that it would not charge, without the consent of the Atchison Company, less than 1½ current railroad tariff freight rates on any matter from or to any points whatever upon the said named railroad lines, except where it should be necessary to do so to meet the competition of other express companies.

By article 6 the Atchison Company further agreed that it would permit the Express Company, and that the Express Company should be entitled, without further additional compensation, to send both ways, over the railroad lines covered by the contract, all its empty messenger safes, boxes, packing trunks, and bullion bags, and should also have the privilege of sending, free of charge, one person on each of said passenger trains as messenger in charge of its property and the property confided to it for carriage, and, when necessary, additional messengers as helpers, or armed as guards for the protection of the Express Company; that such messengers or guards should ride in the car provided by the Atchison Company for the carriage of the goods and property of the Express Company; and the Atchison Company agreed that it would carry the officers, agents, and employés of the Express Company, free of charge, on passenger trains running upon any of the railway lines covered by the contract, whenever such

officers, agents, or employés should be traveling on the business of the Express Company, and for that purpose would, upon the request of the Express Company, furnish transportation to such officers, agents, and employés. Then follow various provisions not important to be mentioned.

By article 10 of the contract the Atchison Company agreed, in consideration of the advantages to be derived from the agreement, that it would not engage, and that none of the companies whose lines are covered by the contract would engage, during the existence thereof, in the express business, nor permit any of its or their employés to receive, carry, or deliver express matter, and that the Express Company should have the exclusive right to conduct the express business on each and every of the said lines of railroad covered by the contract, and that, during the existence of the contract, the Atchison Company, so far as it legally might, would, by all fair and proper means, encourage, facilitate, foster, and promote the business of the Express Company on the lines covered by the contract, and on any other lines over which the Express Company might conduct an express business; and the Express Company agreed that it would encourage, facilitate, foster, and promote the business of the Atchison Company, and of the companies whose lines are or might be covered by the contract.

By article 11 the Atchison Company further agreed that, in addition to the lines mentioned in the contract, therein stated approximately at 9,200 miles, the contract should include any and all other lines of railroad which either it or any of the companies whose lines are embraced in the contract should thereafter, during its existence, own, lease, operate, or control.

By article 12 it was provided that, if the Atchison Company or any of the railroad companies whose lines are included in the contract, should thereafter own, lease, operate, or control any line or lines of railroad not then included in the contract, the Express Company should transact the express business on and over such line or lines of road so soon as such company should be legally able to give to the Express Company the right to do the express business thereon, provided that the Express Company should pay to the Atchison Company for the right to do an express business on and over such line or lines which, in addition to the lines then covered by the contract, the Atchison Company might thereafter own, lease, operate, or control, such amount as might be determined to be fair, just, and reasonable by three arbitrators to be selected in a certain prescribed manner.

By article 13 it is provided that the Express Company should have the right to, and should, operate all extensions of the then existing lines covered by the contract which might be made during its existence, upon the payment of such compensation as might be determined by three arbitrators thereinafter provided for,—such right upon the part of the Express Company to terminate with the expiration of the contract; that is to say, January 1, 1898.

By article 14 it was declared to be the true sense, meaning, and intention of the contract to give the Express Company the exclusive right to do an express business on and over all of the lines mentioned

in the schedule attached thereto, to wit, the lines already named, and over such other lines as might, by extension, purchase, lease, or contract, be subject to the control of the Atchison Company, or to any of the companies named, in accordance with the terms and conditions provided for in the contract.

By article 15 the Express Company covenanted and agreed, in consideration of the premises and of the benefits and facilities conferred upon it by the contract, that it would, to the best of its ability, perform all of the duties thereby imposed on it, and that it would not divert from the lines then or thereafter covered by the contract any express business which properly, fairly, or reasonably should be sent over the said named lines, or any portion thereof, and that it would not, without the consent of the Atchison Company, enter into any contract, agreement, or arrangement for obtaining the right to do an express business over any line or lines which then were or might be competitive with the lines covered by the contract, nor would it do an express business over any such competitive lines: provided, that the covenant should not be construed to limit or interfere with the right of the Express Company to continue doing an express business over any and all lines with which it then had contracts for transacting an express business, or limit or prohibit its right to renew such contracts on their expiration.

By article 16 it was declared that the contract was made by the Atchison Company for and in behalf of itself and the lines controlled and operated by it, and for and in behalf of the said St. Louis & San Francisco Railway Company, Gulf, Colorado & Santa Fé Railway Company, Atlantic & Pacific Railroad Company, Southern California Railway Company, Colorado Midland Railway Company, and Sonora Railway Company, and for and in behalf of all other companies whose assent might be required by the provisions of the contract, and the Atchison Company thereby undertook and agreed to secure the assent of each and every of said named companies, and guarantied that each and every of said named companies would carry out, observe, and perform all of the conditions and obligations of the contract; and the Atchison Company further agreed to receive from, and receipt to the Express Company for, all sums of money which might or should become payable under the contract, and to distribute the same to the various companies interested therein as they might be entitled thereto, and to save the Express Company harmless from all claims of said named companies, or any of them, on account of such compensation.

Provision was next made for the submission to arbitrators of any and all questions that might arise touching the agreement, or the construction of any part thereof, or concerning the business to be carried on thereunder, upon which the parties could not agree; and it concluded with the provision that the contract should go into effect January 1, 1893, and should terminate January 1, 1898.

The contract was approved, ratified, and confirmed on December 6, 1892, by the Sonora Railway Company, Limited; on December 15, 1892, by the St. Louis & San Francisco Railway Company; on December 15, 1892, by the Colorado Midland Railway Company; on De-

cember 17, 1892, by the Gulf, Colorado & Santa Fé Railway Company; on January 12, 1893, by the Atlantic & Pacific Railroad Company; and on February 27, 1893, by the Southern California Railway Company.

In the schedule annexed to the contract, the mileage used by trains handling express matter is given as follows: Of the Atchison, Topeka & Santa Fé Railroad Company, 4,582.12 miles; of the Gulf, Colorado & Santa Fé Railway Company, 1,058 miles; of the Southern California Railway Company, 490.98· miles; of the New Mexico & Arizona Railroad Company, 87.78 miles; of the Sonora Railroad Company, Limited, 262.61 miles; of the St. Louis, Kansas City & Colorado Railroad Company, 61.40 miles; of the Wichita & Western Railway Company, 120.11 miles; of the St. Louis & San Francisco Railway Company, 1,323.17 miles; of the Atlantic & Pacific Railroad Company, Central Division, 112.05 miles; of the Atlantic & Pacific Railroad Company, Western Division, 818.54 miles; of the Manhattan, Alma & Burlingame Railway Company, 56.62 miles; and of the Colorado Midland Railway Company, 335.42 miles.

The action is upon the contract, the substance of which, so far as pertinent to the present cause, has been stated. At the time this contract was made, the Atlantic & Pacific Railroad Company, Western Division, operated its 818.54· miles of railroad, extending from Albuquerque, N. M., to Mojave, in the state of California, under the act of congress approved July 27, 1866. On December 23, 1893, the property of the Atchison Company was by the action of the circuit court of the United States for the Eighth circuit, district of Kansas, placed in the hands of John J. McCook, Joseph W. Reinhart, and Joseph C. Wilson, as receivers. In January, 1894, the Western Division of the Atlantic & Pacific Railroad Company, extending, as has been said, from Albuquerque to Mojave, was placed in the hands and custody of the same persons, as receivers, by the respective United States courts through whose jurisdiction the road was constructed and operated. Subsequently the St. Louis & San Francisco Railway Company and the Colorado Midland Railway Company were each placed in the hands of the same receivers, by competent courts having jurisdiction of the respective roads. The Gulf, Colorado & Santa Fé Railway Company, the Southern California Railway Company, and the Sonora Railway Company were never placed in the hands of receivers, but during all of the times involved in this cause were operated under and through their respective organizations. In 1894 Reinhart resigned his position of receiver, in each case in which he was appointed, and Aldace F. Walker was by the respective courts appointed his successor. In the fall of 1895 Wilson died, and no successor to him was appointed by either of the courts referred to. During the year commencing January 1, 1893, and up to the time of the appointment of the receivers of the Atchison Company, which was in the latter part of December, 1893, the Express Company, under the terms of the contract in question, paid to the Atchison Company the guarantied amount of $1,450,000, in monthly installments of one-twelfth thereof each month. The money so received was apportioned by the Atchison Company among the other parties named in

the contract in the various sums agreed upon between such other railroads and the Atchison Company. The monthly proportion of this money so paid by the Express Company and apportioned by the Atchison Company to the Atlantic & Pacific Railroad Company, Western Division, during this period, was $13,911.73. Subsequent to the appointment of the various receivers of the properties of the several railroad companies that were placed in the hands of such receivers, they (the said receivers) and the several railroads not in the hands of receivers, named in the contract in question, continued the carrying out of the contract in accordance with its terms and conditions, until the modification thereof on May 22, 1895, as next hereinafter stated. The receivership of the Colorado Midland Railway Company withdrew from the agreement on or about May 1, 1895. Upon its withdrawal the contract of December 1, 1892, continued to May 22, 1895, by the mutual consent of the remaining parties, without change, except that there was deducted from the total payments made each month the amount that had theretofore been apportioned by the Atchison Company to the Colorado Midland Railway Company. On that day, to wit, May 22, 1895, article 2 of the contract of December 1, 1892, was, upon the request of the Express Company, and by the authority, so far as concerned the various receivers, of the respective courts appointing and having jurisdiction over them, modified as stated in the following communication:

"Wells, Fargo & Co.—Recvrs. A., T. & S. F. R. R.

"May 22, 1895.

"Modification of Article 2, Original Agreement, Covering Express Facilities.

"A., T. & S. F. R. R. System.

"Aldace F. Walker, John J. McCook, and J. C. Wilson, Receivers.

"New York, May 22, 1895.

"Messrs. Wells, Fargo & Co.—Gentlemen: The receivers of the A., T. & S. F., with the concurrence of the other parties to your contract of Dec. 1, 1892, as evidenced by their signatures hereto, hereby consent that the minimum mentioned in article 2 of said contract be reduced to the sum of $1,310,000.00 per annum; the Colorado Midland having withdrawn from the contract May 1, 1895.

"Yours, truly,                                    Aldace F. Walker,
                                                 "John J. McCook,
                                                 "J. C. Wilson,
                                                                "Receivers.

"Agreed to by the undersigned:
                              "Sonora Railway Company,
                                      "By Aldace F. Walker, President.
                              "St. Louis & San Francisco Ry.,
        "By Aldace F. Walker, John J. McCook, J. C. Wilson, Receivers.
                              "Gulf, Colorado & Santa Fé Ry. Co.,
                                      "By Aldace F. Walker, President.
                              "Atlantic & Pacific Railroad,
        "By Aldace F. Walker, John J. McCook, J. C. Wilson, Receivers.
                              "Southern California Ry. Co.,
                                      "By Aldace F. Walker, President.
                              "Wells, Fargo & Co.,
                                      "By [Sgd.] Jno. J. Valentine,
"A true copy.                                                 President.
        "[Sgd.]   J. F. Scott, for Sec'y A., T. & S. F. R. R. Co.
"Topeka, 7/3, 1895."

From May 22, 1895, to January 1, 1896, the contract of December 1, 1892, as modified by the agreement last set out, was fully carried out by all of the parties to it, except the Colorado Midland Railway Company, which, as before stated, withdrew therefrom May 1, 1895, and there was paid to the receivers of the Atchison Company monthly by the Express Company, after the said modification, one-twelfth of $1,310,000, which the Atchison Company apportioned and divided, as fixed or agreed upon, to the various other beneficiaries; the portion so fixed or agreed upon and paid to the receivers of the Atlantic & Pacific Company after the modification being the sum of $12,565.08 per month. On the 1st day of February, 1896, the receivers, theretofore appointed, of the Atlantic & Pacific Railroad Company's property, resigned; and, their resignations having been accepted, the plaintiff herein, C. W. Smith, was duly appointed receiver in their stead. The property of the Atchison Company was sold under a decree of foreclosure entered in the United States circuit court for the district of Kansas, and, pursuant to the terms of the decree, the entire property of that company was transferred to the purchasers thereof, by the Atchison Company's receivers, at midnight on December 31, 1895, and was by such purchasers at once transferred to the Atchison, Topeka & Santa Fé Railway Company, a corporation incorporated under the laws of Kansas, which took possession of the property on the 1st day of January, 1896. Under the decree by virtue of which the property was sold, the purchasers had 90 days within which to affirm or disaffirm any of the contracts existing with the old Atchison Company, or with the receivers thereof, including the contract in question. From January 1 until May 1, 1896, the services required to be performed by the various railroad companies for the Express Company under the contract of December 1, 1892, were fully performed, except in so far as the failure on the part of the Colorado Midland Company was concerned; and the Express Company paid to the Atchison, Topeka & Santa Fé Railway Company, monthly, one-twelfth of the sum agreed upon by the modification of the contract in question of May 22, 1895, to wit, $1,310,000, to be distributed by it to the parties to whom it belonged. On the 30th day of January, 1896, however, the president of the Atchison, Topeka & Santa Fé Railway Company wrote to the president of the Express Company a letter of which the following is a copy:

"Atchison, Topeka & Santa Fé Railway System.

"President's Office.

"Chicago, January 30th, 1896.

"John J. Valentine, Esq., President Wells, Fargo & Company, San Francisco, California—Dear Sir: I am pleased to be able to advise you that the contract between Wells, Fargo & Company and the Atchison, Topeka and Santa Fé Railroad Company has had the attention of the officers of the Atchison, Topeka & Santa Fé Railway Company, and that this company is willing to operate on the terms of this contract, so far as concerns its railroad and the companies embraced in its system. This, however, does not embrace the Colorado Midland, the Atlantic & Pacific, the St. Louis & San Francisco, the Manhattan, Alma & Burlingame, the St. Louis, Kansas City & Colorado, and the Wichita & Western; these roads being in the hands of receivers. While this company does not assume responsibility for the performance of the

contract by the companies owning these lines or the receivers operating them, it will continue for the present, with the consent of the receivers of these roads, to receive and distribute the monthly payment due to them under the contract; but it may become necessary for you hereafter to deal with them directly.     Yours, truly,     [Signed]  E. P. Ripley."

In response to the foregoing letter, the president of the Express Company wrote the following:

"San Francisco, February 10th, 1896.

"Mr. E. P. Ripley, President Atchison, Topeka & Santa Fé Ry. Co., New York City—Dear Sir:  Acknowledging your favor of the 30th, which shall have further consideration at my hands, will you kindly inform me what allotments you make, or that have been made to the present time, in the way of rentals, to the Atlantic & Pacific, the St. Louis & San Francisco, the Manhattan, Alma & Burlingame, the St. Louis, Kansas City & Colorado, the Wichita & Western Railroads; these roads, as you state, being in the hands of receivers, and not subject to the contract of the Atchison, Topeka & Santa Fé Company.

"Very truly yours,     [Signed]  Jno. J. Valentine, President."

On February 20, 1896, Mr. Ripley again wrote Mr. Valentine as follows:

"February 20th, 1896.

"Mr. Jno. J. Valentine, President Wells, Fargo & Co., San Francisco, Cal.—Dear Sir:  I beg to acknowledge receipt of your letter of February 10th.  The allotments made of the express earnings as at present are based on an arbitrary, which really shows nothing, and should in no way be taken into account as a basis for future action.  I understand, from reading certain correspondence between you and Mr. Walker, that you have not kept the accounts separately, as between the system lines, for the last year or so, and that you cannot show just what amounts each line has earned.  Your opinion, however, on this matter, will be of great value to me; and I should be pleased to have you advise me, based possibly on the respective earnings for the last year for which you have them separated, what proportions you think should be allowed to the several lines not now in the Atchison System.

"Yours, truly,     E. P. Ripley."

This was followed on the 24th day of February, 1896, by the following letter on the part of the Express Company:

"San Francisco, February 24th, 1896.

"Mr. E. P. Ripley, President Atchison, Topeka & Santa Fé Ry. Co., Chicago, Ills.—Dear Sir:  Referring to your favor of the 30th ulto., the receipt of which was acknowledged by my letter to you of the 10th inst., making certain inquiries and promising to give yours further consideration,—to which I have as yet not received an answer, doubtless owing to your absence:  In view of your statement that the Atchison, Topeka & Santa Fé Ry. Co. would no longer be responsible for the performance of the contract formerly existing between it and Wells, Fargo & Company, so far as concerns the Colorado Midland, the Atlantic & Pacific, the St. Louis & San Francisco, the Manhattan, Alma & Burlingame, the St. Louis, Kansas City & Colorado, and the Wichita & Western Railroad Companies, but that said Santa Fé Railway Company was willing to continue to furnish express services on its own system, etc.:  As advised, the contract referred to is terminated, and it may become necessary for me to negotiate directly with the companies mentioned above as to future services to be rendered by them.  We therefore, while reserving all legal rights in the premises pending adjustment by a new agreement, will, for the month of February and thereafter pending existing conditions, advance $109,000 per month to the Santa Fé Company, for itself and for the receiver companies you name, until 55% of monthly gross earnings be ascertained, and a final adjustment reached on that basis.  I ask your company, and through you the receiver companies, so far as your relations admit, to consider, in the matter of readjustment, the equities of our situation.  The terms hitherto paid are onerous, and should be modified.  I submit the following statement of express rentals paid

to the leading railroads west from Chicago as amply sufficient reasons: An average of three years, ending June 30th, 1892, to June 30th, 1894, of mileage, gross earnings, and express rentals per mile, for following railroads (taken from interstate commerce commission reports for 1892-3-4):

|  | Mileage. | Gross Earnings Per Mile. | Express Rental Per Mile. |
|---|---|---|---|
| C. & No.-Western System | 7,976 | $5,706 84 | $ 86 96 |
| C., R. I. & Pacific Ry | 3,551 | 5,203 56 | 95 58 |
| C., M. & St. Paul Ry | 5,902 | 5,119 12 | 104 49 |
| C., B. & Q. System | 7,091 | 5,094 67 | 123 53 |
| Mo., Kas. & Texas Ry | 1,823 | 5,008 87 | 84 62 |
| Chicago Gt. Western Ry | 922 | 4,709 92 | 83 01 |
| Union Pacific System | 7,383 | 4,657 70 | 79 34 |
| A., T. & S. F. System | 9,088 | 4,564 36 | 138 07 |
| ditto, present mileage | 8,900 | (inc. receiver lines) | 148 00 |
| Texas & Pacific Ry | 1,499 | 4,445 18 | 113 45 |
| Northern Pacific System | 4,569 | 4,397 87 | 71 77 |
| Int. & Gt. Northern Ry | 775 | 4,276 53 | 97 00 |
| Missouri Pacific System | 5,581 | 4,210 49 | 89 36 |
| Great Northern Ry | 3,347 | 3,544 31 | 45 99 |

"As you will perceive, the Santa Fé and receiver companies are paid a mileage express rental of 70% more than the Chicago & Northwestern Co., while its general railroad business is 20% less; 40% more than the Chicago, Milwaukee & St. Paul, while its general business is 11% less than that road; and 20% more than the Chicago, Burlington & Quincy System, in comparison with which its general business is 10% less. You and the officers constituting the management of the Atchison, Topeka & Santa Fé are gentlemen of high character. All we ask is equity,—fair treatment. Our position has enabled us, and does now enable us, to serve the Atchison, Topeka & Santa Fé more effectively than any other company possibly could, and that fact ought not to subject us to injustice in the way of excessive rentals. Expecting to have the pleasure of conferring with you in Chicago next month, and bespeaking your favorable consideration, I am,

"Very truly yours,          Jno. J. Valentine, President."

On the same day the president of the Express Company wrote to the plaintiff herein, as receiver of the Atlantic & Pacific Company, the following letter, inclosing a copy of his letter of the same date to Mr. Ripley:

"San Francisco, February 24th, 1896.

"My Dear Mr. Smith: In compliance with my promise, I herewith inclose you copy of a letter written to Mr. Ripley to-day. In checking over the gross earnings of railroads, we discovered that the Missouri Pacific had been credited with over a thousand dollars per mile more than it was entitled to, which, as you will see, has been corrected in the letter to Mr. Ripley.

"Yours, truly,          Jno. J. Valentine.

"Mr. C. W. Smith, Receiver A. & P. Ry., Albuquerque, N. M."

On July 1, 1896, Mr. Valentine, on behalf of the Express Company, wrote the following letter to Mr. Smith, as receiver of the Atlantic & Pacific Company:

"San Francisco, July 1st, 1896.

"Mr. C. W. Smith, Receiver Atlantic & Pacific Ry., Albuquerque, N. M.— Dear Sir: Acknowledging your telegram of 29th ulto., and referring to within copy of telegram sent to New York 13th ulto. for your information, I have to say that through business, particularly westward, has been steadily falling off for a number of months past, and we find the aggregate of it is over 15 per cent. for the period from December to June; but the greater decline is in the latter months, especially May and June, which have fallen off about 30 per cent. The decline has become so marked that I had communicated by letter

with our officials here and had an old employé, Capt. Bradford, appointed solicitor, and herewith inclose copy of letter which he has filed, without any idea or knowledge that I was going to write to you upon such a subject. I also inclose copy of a letter from Col. Evans of the 12th ult. on same subject. The situation is practically this: The Sunset Line brings New York freight into San Francisco in 14 days by New Orleans, as I understand it, upon guaranty. To meet this a fast freight line is now operating via the Vanderbilt lines, Northwestern and Union Pacific and Central Pacific lines, also making the time in 11 days, which is guarantied. These lines carry freight at the rates Capt. Bradford mentions. The strenuous rivalry they are waging has reduced our through business as stated. I refer to this only to show what is going on in the way of impairing express business, and to explain to you why we will be constrained to ask substantial relief from past requirements. Our express department has not earned a dividend for three years. I send you exchange on New York for $18,000,—$9,000 per month for May and June,— but will not thereby commit ourselves to that, as a guaranty, or otherwise.

"Yours, truly,                       .               Jno. J. Valentine, President."

"San Francisco, June 11th, 1896.

"Mr. Jno. J. Valentine, President, etc., San Francisco—Dear Sir: In accordance with your instructions, I was assigned to duty as solicitor by General Agent Titus on May 22nd, since which time I have been at work with but little success. I find the railroad company is active in soliciting, and, with decreased rates, is successful. It guaranties not over 15 days between New York and San Francisco, and not unfrequently places the goods here in 12 days, with rates of $1.50, $2.20, and $2.50 per 100 pounds, which is excluding Wells, Fargo & Co. from the patronage of the merchants on through business from the East. The few merchants that I have seen express wishes to deal with Wells, Fargo & Co., but claim that $14.00 for 7 days is not near enough to $1.50, $2.20, or $2.50 for 12 to 14 days to avail themselves of express service. In each instance I have been most kindly received, and listened to attentively. The disparity in rates is marked, and the difference in time is not sufficient to overcome it.

"Yours, truly,                           [Signed]   J. O. Bradford, Solicitor."

"New York, June 12th, 1896.

"Mr. E. M. Cooper, Manager, San Francisco—Dear Sir: We experienced some falling off at New York in the May business, as compared with the same month in 1895. The total decrease was $4,619.12. In analyzing this deficit, I find it is principally on out business for San Francisco. San Francisco May business in 1895 amounted to $13,997.40; May, 1896, $11,063.03, a decrease of $2,934.47 (21 per cent.), leaving $1,684.65 deficit, to be distributed amongst seven other principal Western points. It seems to me a little missionary work amongst our patrons on the Pacific Coast might increase the volume of shipments westward.

"Yours, truly,                       .               [Signed]   Dudley Evans, Manager."

"San Francisco, June 13th, 1896.

"Dudley Evans, for C. W. Smith: Approximate gross business $215,000, but, traffic having fallen off radically as compared with last year, I apprehend $215,000 is too high a figure for future earnings. Approximate analysis of business Mojave and North, 64 per cent.; Barstow and South, 17 per cent.; Arizona connections, 3 per cent.; to and from line, 10 per cent.; strictly local, 5 per cent. I will write Mr. Smith, at Albuquerque.

"Jno. J. Valentine."

In response to the last-mentioned letter of Mr. Valentine, Mr. Smith wrote as follows:

"July 7th, 1896.

"Mr. Jno. J. Valentine, President Wells, Fargo and Co., San Francisco, Cal.— Dear Sir: I have yours of the 1st, together with check on New York for $18,000.00, which amount I have instructed our accounting department to credit your company on account. I have noted carefully your allusions to the falling off in express traffic generally, and your attributing the reasons for

96 F.—25

such decrease to the fact that the Sunset Line brings New York freight into San Francisco in 14 days by New Orleans, upon a guaranty of the time in transit, and to meet this a fast line is now operating via. the Vanderbilt, Northwestern, Union Pacific, and Central Pacific Lines, also making time in 14 days, which is guarantied, and etc., and etc. Now, if this was a new movement on the part of the Sunset and the Northwestern, Union Pacific Lines, as you infer, then I would be inclined to concede that the causes of the decrease in question put forth were well founded; but in view of the fact that both the Sunset and U. P. Lines have been for years past contracting freight from Atlantic Coast points to Pacific Coast points on a guaranty time schedule not exceeding fifteen days, I feel confident that your reckoning is misplaced.    I would not be surprised, however, if the entire cause of your decrease in merchandise tonnage was attributable to the extremely low rates prevailing with transcontinental lines, but I am pleased to inform you that the latter condition will soon be a thing of the past, as it is now understood that the new transcontinental rates that have been agreed upon will take effect August 1st next, which will be an advance over present rates of at least 25%, to which action on the part of the transcontinental lines I feel confident your people will not protest.    Regarding a fair and equitable understanding between your company and the receiver of the Atlantic & Pacific Railroad Company which shall prevail during my receivership, I have this suggestion to make, to which I do not believe that you can consistently take exceptions.    It is this:    The contract now in effect between your company and the Atchison, Topeka & Santa Fé Railway Company is practically the same as the agreement that prevailed during the receivership of that company. Now what we want—and I make the demand predicated upon what I believe is absolute justice—is that this road be allowed the same express revenue per month it will be entitled to when it becomes a part of the Atchison System, as it probably will within the next six or eight months.    Can you say nay to this?        Very truly yours,            `[Signed]    C. W. Smith."

This letter was answered by Mr. Valentine on July 31, 1896, as follows:

"San Francisco, July 31st, 1896.

"Mr. C. W. Smith, Receiver, etc., Atlantic & Pacific Ry. Co., Albuquerque, N. M.—Dear Sir:    In directing our cashier to-day to forward you $9,000 for the month of July, I do so subject to my notice relative to the remittances for May and June; adding that I will either discuss the matter with you by letter later on, or see you in person.    Of course, you understand that the rental to the Santa Fé Company remains excessive, and therefore, from our standpoint, you should not expect for the A. & P. the rate that we are compelled to pay the Santa Fé, or that we would under our Santa Fé contract.    In other words, the rate paid that company is excessive, and there is no good reason why we should on that account pay so high a one to the Atlantic & Pacific.
"Yours, very truly,                        Jno. J. Valentine, President."

On December 28, 1896, Mr. Valentine, on behalf of the Express Company, wrote to the plaintiff as follows:

"San Francisco, December 28th, 1896.

"Mr. C. W. Smith, Receiver Atlantic & Pacific Ry., Albuquerque, N. M.—Dear Sir:    Referring to sundry correspondence between us,—mine of July 1st, 10th, and 31st, yours of July 7th,—I have to say that for some years past we have in general divided the business for Central California between Pueblo and Oregon and the Albuquerque and Mojave routes, but in the spring and summer months of this year almost the entire tonnage happened to be sent by the Atlantic & Pacific; hence a larger portion had necessarily to be sent during the later months via. Ogden, and the earnings to A. & P. are and will be consequently appreciably less.    Therefore, from and after December 1st, 1896, we will remit as an advance payment $7,000 per month.    The business strictly local to the line (that is to say, business pertaining to points on the line) does not exceed 8 per cent. of the entire tonnage, so that for every dollar which must absolutely pass over the A. & P. line there are $12 of divertible business.    Flanked on both sides as the Atlantic & Pacific road is by the

highways from Ogden and Deming, we are justified in asking just terms. Moreover, the great damage by fire we have suffered for years past has almost all occurred on the Atlantic & Pacific Lines, because of defective cars, tracks, inferior coal. etc. These are merely some of the reasons for asking and expecting a moderate percentage rate,—certainly not to exceed 50 per cent. I will write you again this week, giving you the movement of tonnage for 1896, and hope to see you soon, as you have intimated a visit to California at no distant date. With all good wishes of the season, I am,

"Very truly yours, Jno. J. Valentine, President."

And on January 30, 1897, the president of the Express Company again wrote to Mr. Smith as follows:

"San Francisco, January 30th, 1897.

"Mr. C. W. Smith, Receiver Atlantic & Pacific Ry., Albuquerque, N. M.— Dear Sir: Referring to my letter of December 28th, 1896, and to our discussion of matters of mutual interest between the Atlantic & Pacific and Wells, Fargo & Co. in my office the 13th inst., and confirming my former remarks: I find by reference to the matter that at 50 per cent. we have, up to December 31st, probably overpaid the A. & P. some. $7,000, approximately. Hence we will not make any remittance for the present month of January, as the aggregate amount already paid the road from May to December inclusive, $70,000, will probably be 50 per cent. of the business transacted thereon for nine months,— from May 1st, 1896, to January 31st, 1897; the present month estimated. This rate would constitute a rental of some $93,000 per annum, or an average of $112 per mile, while the express rentals of the following roads, having a much greater gross traffic per mile per annum, are as follows:

|  | Mileage. | Gross Earnings Per Mile. | Express Rental Per Mile. |
|---|---|---|---|
| C. & No.-Western System | 7,976 | $5,706 84 | $ 86 96 |
| C., R. I. & Pac. Ry | 3,551 | 5,203 56 | 95 58 |
| C., M. & St. Paul Ry | 5,902 | 5,119 12 | 104 49 |
| Mo., Kas. & Texas Ry | 1,823 | 5,008 87 | 84 62 |
| Chicago Gt. Western Ry | 922 | 4,709 92 | 83 01 |
| Union Pacific System | 7,383 | 4,657 70 | 79 34 |
| Northern Pacific System | 4,569 | 4,397 87 | 71 77 |
| Int. & Gt. Northern Ry | 775 | 4,276 53 | 97 00 |
| Missouri Pacific System | 5,581 | 4,210 49 | 89 36 |
| Great Northern Ry | 3,347 | 3,544 31 | 45 99 |
| A. & P. R. R | 830 | 4,025 00 | 112 00 |

"Yours, truly, Jno. J. Valentine, President."

In response to the letter last mentioned, Mr. Smith on the 9th day of February, 1897, wrote to the president of the Express Company as follows:

"Atlantic & Pacific Railroad Company, Western Division.

"C. W. Smith, Receiver & Gen'l Manager, Albuquerque, N. M.

"Chicago, Ills., Feb. 9th, 1897.

"Mr. J. J. Valentine, President Wells, Fargo & Company, San Francisco, Cal.—Dear Sir: I am in receipt of yours of the 30th, and have noted with a good deal of interest your arguments elaborately set forth to show how rapidly the express earning capacity of the A. & P. has declined during the past few months. In this connection I desire to advise you that I am, as you know, an officer of the court, and must be governed by its decrees in the management of the Atlantic & Pacific Railroad Company property. Therefore I must respectfully call your attention to the following decree:

" 'The Mercantile Trust Company, Complainant, vs. The Atlantic and Pacific Railroad Company and the United States Trust Company of New York, Defendants.

" 'Now, on this first day of June, A. D. 1895, the receivers heretofore appointed in the above-entitled cause presented their verified petition therein, ask-

ing for authority to unite with the receivers of the Atchison, Topeka and Santa Fé Railroad Company, and with the other auxiliary railroad companies of the Atchison, Topeka & Santa Fé System, in modifying the contract of the first day of December, 1892, between the Atchison, Topeka & Santa Fé Railroad Company and Wells, Fargo and Company, which was by the terms of said contract and by the agreement with the Atlantic & Pacific Railroad Company made applicable to, and a contract for and on behalf of, the Atlantic and Pacific Railroad Company, as well as a contract by and between the parties hereto. And it being made to appear that notice of said application was duly given and served upon the defendant the United States Trust Company of New York, and upon the plaintiff, the Mercantile Trust Company of New York, and upon the Atlantic and Pacific Railroad Company, and the Atlantic & Pacific Railroad Company appearing by its solicitor, Karl A. Snyder, the Mercantile Trust Company appearing by its solicitor, W. B. Childers, and the receivers of the Atlantic & Pacific Railroad Company appearing by its solicitor, C. N. Sterry, said application was duly heard and considered, and upon consideration thereof, it is ordered that the receivers heretofore appointed in the above-entitled cause be, and they are hereby, authorized to unite with the receivers of the Atchison, Topeka and Santa Fé Railroad Company, with the St. Louis and San Francisco Railway Company, and with the other auxiliary railway companies of the Atchison, Topeka and Santa Fé Railroad System, in carrying out the agreement shown to have been made by and between the receivers of the Atchison and Topeka and Santa Fé Railroad Company and Wells, Fargo and Company under the order of the Honorable Henry C. Caldwell, circuit judge of the United States circuit court, as shown by said petition; and it is further ordered that the receivers heretofore appointed be, and they are hereby, authorized to make such agreement or contract with Wells, Fargo and Company as may be agreed upon by the receivers of the Atchison, Topeka and Santa Fé Railroad Company, the receivers of the St. Louis and San Francisco Railway Company, and other auxiliary railroad companies of the Atchison, Topeka & Santa Fé Railroad System.

          " 'N. C. Collier, Judge of the District Court,
          " 'Second Judicial District, Territory of New Mexico.'

"On perusal of the foregoing decree, you will doubtless appreciate the fact that, inasmuch as the contract in question with your company has never been disaffirmed by either my predecessors or by myself, the agreement must necessarily be considered as being still in full force and effect, and in our settlement with your company we cannot recognize any statements of accounts emanating from your office or from your accounting department that are not made up strictly in accordance with the contract that was in force when the above decree was promulgated by the court.

          "Very truly yours,                    [Signed]   C. W. Smith."

On February 27, 1897, the president of the Express Company wrote to the plaintiff the following letter:

                              "San Francisco, February 27th, 1897.

"Mr. C. W. Smith, Receiver Atlantic & Pacific Railway, Albuquerque, N. M. —Dear Sir: Acknowledging your letter of the 9th inst. concerning business relations between Wells, Fargo & Company and the Atlantic & Pacific Railroad since the reorganization of the Santa Fé System and its abrogation of the express contract: The following suggestions are offered for your consideration: The last original contract between Wells, Fargo & Company and the Santa Fé System (previous to the existing one of May, 1896) was made by that company, representing itself and controlled roads, including, among others, the Atlantic & Pacific. When the Santa Fé Company went into the hands of receivers, an application was made to Judge Caldwell to modify that contract; and an order was made to that effect, which is referred to in the copy of an order subsequently made by Judge Collier, and set forth in your letter. By virtue of the authority given by Judge Caldwell, the receivers of the Santa Fé Company modified that original contract; their action was approved by Judge Collier; and it is that proceeding which is invoked by you as authority for claiming compensation as provided in the modified contract.

But, after the Santa Fé System was reorganized and the receivers discharged, the president of that company gave notice that the Santa Fé R. R. Co. would no longer be responsible for the enforcement of that modified contract, and suggested that Wells, Fargo & Company should make arrangements severally with the controlled and auxiliary roads included in the former modified contract. The president of the Santa Fé having announced that his company would no longer be responsible for the performance of the original contract as modified. Wells, Fargo & Company made separate arrangements with that company and several others of the former Santa Fé System for express facilities. I submit that the former existing arrangement was discontinued by the Santa Fé and other contracting parties: that the contract was an entirety, and became ineffectual whenever any company composing the system was eliminated from it, and was not held bound by the terms thereof. It was upon this theory that Judge Caldwell finally announced, at St. Paul, that he would not undertake to enforce the original contract against Wells, Fargo & Company, but authorized the receivers to enter into a modified contract. Now, that modified arrangement was made with the receivers of the Santa Fé Company, and lasted during the time of the receivership, but did not, it would seem, bind the Santa Fé Company as reorganized and relieved from the receivership. At least this appears to have been the view taken by President Ripley, and to explain his action in the premises as the official representative of that company. Hence your theory that the ruling of the court upon a contract that expired of itself, because of the noncohesion of the original parties thereto, and because of the radical change of organization in the party of the first part, is still binding as between the Atlantic & Pacific Railroad and this company, seems not to have a reasonable foundation. Our auditor will remit you $7,000 for the month of February, as approximating the earnings of the line at 50%, which is a fair and reasonable rental, as shown in mine of January 30th. However, since drafting the foregoing, I have received the interstate commerce commission's report, latest date fiscal year of 1895, and append the following therefrom:

|  | Mileage. | Gross Earnings Per Mile. | Express Rental Per Mile. |
|---|---|---|---|
| C. & N. W. Ry. | 5,030 | $5,606 | $112 64 |
| do.    System | 7,938 | 4,782 | 107 13 |
| C., R. I. & Pac. Ry. | 3,571 | 4,523 | 114 60 |
| C., M. & St. P. System | 6,206 | 4,431 | 116 00 |
| M., K. & T. Ry. | 2,060 | 5,692 | 94 50 |
| Chi. Great Western | 924 | 3,886 | 81 15 |
| Union Pacific Ry. | 1,836 | 7,951 | 122 84 |
| do.    System | 4,903 | 4,615 | 72 28 |
| Northern Pacific Ry. | 4,649 | 3,797 | 53 95 |
| Int. & Grt. Nor. Ry. | 775 | 4,503 | 84 93 |
| Missouri Pac. System | 4,992 | 4,500 | 90 80 |
| Great Northern Ry. | 3,766 | 3,490 | 43 45 |

"All of which is respectfully submitted.

"Very truly yours,    Jno. J. Valentine, President."

On March 17, 1897, Mr. Smith again wrote to the president of the Express Company, the following letter:

"Albuquerque, N. M., Mch. 17, 1897.

"Mr. J. J. Valentine, President Wells, Fargo and Co., San Francisco, Cal.— Dear Sir: In further support of the subject of my letter to you under date of February 9th, to which you replied on February 27th, I desire to call your attention to the opinion very forcibly expressed by Judge C. N. Sterry, attorney & solicitor for the receiver, dated the 15th, herewith inclosed. If it is true, as Judge Sterry alleges (and I do not doubt but what it is), that I am not vested with power, right, or authority, as receiver, to make any modification in the agreement with your company, except that I do so through Judge Collier. This being the case, I am compelled to say to you that I cannot regard any settlement with Wells, Fargo and Company, except that such settlement

is made on the basis of the agreement or understanding which was brought about through my predecessors, and which was confirmed by the court.

"Very truly yours,                                    [Signed]   C. W. Smith."

### On April 17, 1897, Mr. Valentine replied as follows:

"San Francisco, April 17th, 1897.

"Dear Mr. Smith: While I was absent in Mexico your letter of March 17th came, and, the subject being presented by you in a legal aspect, your communication was referred to our counsel here, Mr. E. S. Pillsbury, who has not yet reported on it. I write this line that you may not deem the delay on my part discourteous. I trust Mr. Pillsbury will give the matter attention soon. His conclusions will be forwarded to you promptly. * * *

"Very truly yours,                          Jno. J. Valentine, President.

"Mr. C. W. Smith, Atlantic & Pacific Rd., Albuquerque, N. M."

### On April 26, 1897, Mr. Smith replied to the last-mentioned letter as follows:

"Pasadena, Cal., April 26th, 1897.

"My Dear Mr. Valentine: I am in receipt of yours of the 17th, which is entirely satisfactory. In this connection, and simply as a reminder, I desire to call your attention to a paragraph or two taken from the original agreement between the A. & P. and Wells, Fargo and Company, which agreement has not expired, and which was never disaffirmed by the receivers: First. Article 19 of the contract reads as follows: 'This contract shall go into effect January 1st, 1893, and shall terminate January 1st, 1898.' Second. As stated in report of the receivers to the Hon. Henry C. Caldwell, circuit judge: 'The contract contains no provision for its modification in any event, being absolute in its terms.' And not only is the life of the contract itself thus definitely and absolutely fixed, but the right of the Express Company to operate any individual line under this contract is just as definitely and absolutely fixed. Third. In article 13 this language is used: 'The right of the Express Company to operate any line or lines that may by virtue of the last two preceding sections be operated by said Express Company shall cease and terminate with the expiration of this contract; that is to say, January 1st, 1898.'

"Very truly yours,                              [Signed]   C. W. Smith.

"Mr. J. J. Valentine, Prest. W., F. & Co., San Francisco, Cal."

On May 27, 1896, the Express Company and the Atchison, Topeka & Santa Fé Railway Company (the new Atchison Company) made a new contract for the future business between it and the Express Company. A copy of this contract is annexed to the amended complaint, and shows that it was a similar agreement to that of December 1, 1892, except that it did not apply to certain railroads included in the former contract; but the amended complaint alleges that the guarantied monthly payments under it aggregated the same sum for the same mileage as was paid or agreed to be paid under the contract of December 1, 1892. The amended complaint also shows that from the 1st day of May, 1896, to the 1st day of July, 1897, the Express Company received and accepted precisely similar services on the part of the receiver of the Atlantic & Pacific Railroad Company, Western Division, that had been given to it under the terms of the contract of December 1, 1892, as modified May 22, 1895, and that it was only able to transact the business so as to form a continuous line from the Pacific Coast to the Atlantic Coast over the Southern California lines by using the Atlantic & Pacific Railroad. The amended complaint further shows that the St. Louis & San Francisco Railway Company and its receivers and the Express Company continued to work under

the modified contract of May 22, 1895, until July 1, 1896, when it entered into a new contract with the Express Company, whereby it was to receive, and it has since received, the same rate per mile as it received under the contract of December 1, 1892, and its modification of May 22, 1895. The amended complaint further shows· that the plaintiff, as receiver of the Atlantic & Pacific Railroad Company, and his predecessors in office, fully carried out all of the terms and conditions that were to be performed by the Atlantic & Pacific Railroad Company under the contract of December 1, 1892, and as the same was modified on May 22, 1895. It further shows that from May 1, 1896, to July 1, 1897, the plaintiff, as receiver of the Atlantic & Pacific Railroad Company, Western Division, not only performed all of the services required by the Express Company, but performed them under a claim as indicated in the correspondence that has been set out, the acquiescence in which by the Express Company is shown, if shown at all, by the same correspondence. It further appears from the amended complaint that the Atlantic & Pacific Company was a link in the transcontinental system known as the "Atchison, Topeka & Santa Fé Route," but was not a member thereof; that all of the express business transacted by the defendant from the Pacific Coast as far east as Chicago, passing over the Atchison, Topeka & Santa Fé System, was carried over the Western Division of the Atlantic & Pacific Railroad. During the period covered by the action, to wit, from May 1, 1896, to July 1, 1897, the defendant paid to the plaintiff each month, on account of the services rendered by him, the sum of $7,000; and it is for the difference between that sum and the monthly sum of $12,585.08 apportioned to the plaintiff under the contract of December 1, 1892, as modified by the agreement of May 22, 1895, aggregating $77,911.12, for which the present action is brought. There is no allegation in the complaint of any prevention by the defendant of full performance of the contract on the part of the plaintiff.

The case is, I think, a very plain one. The contract of December 1, 1892, expressly recites (what is also a matter of common· knowledge) that the Atchison, Topeka & Santa Fé Railroad Company owned several roads, and controlled others, embraced under the name of the "Santa Fé System" or "Route," extending from Chicago to the Pacific Coast. The defendant then was, and had been for many years, doing an extensive express business throughout the United States, and was by far the most important, if it was not the only, company on the Pacific Coast engaged in that business. Naturally, such traffic was of great importance to it, as well as to the railroad companies. The Express Company sought, and by the contract obtained, the exclusive express facilities over the extensive system of railroads owned and controlled by the Atchison Company, and the latter thereby sought and secured the carriage of the large amount of express matter under the control of the defendant. These advantages and purposes are clearly expressed in articles 10 and 14 of the contract, which read as follows:

"Article X. The railroad company further agrees, in consideration of the advantages to be derived from this agreement, that it will not engage, and that

none of the companies whose lines are covered by this contract will engage, during the existence thereof, in the express business; neither will it or any of said companies permit any of its or their employés to receive, carry, or deliver express matter; and that the Express Company shall have the exclusive right to conduct the express business on each and every of the said lines covered by this agreement."

"Article XIV. It is hereby declared to be the true sense, meaning, and intention of this contract to give the Express Company the exclusive right to do an express business on and over all of the lines mentioned in the schedule hereto attached, and of all such other lines as may, by extension, purchase, lease, or contract, be subject to the control of the railroad company, or to any of the companies mentioned in said schedule, in accordance with the terms and conditions herein provided."

It is not necessary to resort to construction to ascertain whether the intent of the contract was to confer upon the Express Company the exclusive express facilities over all of the lines therein mentioned and provided for; for the parties themselves, in express words, declared that to be its true sense and meaning. And it was for those exclusive facilities over all of the lines that the Express Company agreed to pay the Atchison Company 55 per cent. of the entire gross earnings of all kinds, including earnings on money orders received by it in the operation of the express business, upon all of the said lines of railroad, "taken as a whole, as they then existed," and guaranteed that such percentage of the gross earnings "upon all of the said lines of said different railway companies, taken together as a whole, as they then existed," should amount to not less than $1,-450,000 per annum, afterwards reduced by the agreement of May 22, 1895, to $1,310,000. The Atchison Company undertook for itself, and on behalf of all of the other companies referred to, to furnish the exclusive express facilities specified; and the obligation thus assumed by the Atchison Company was afterwards, and at the respective dates already stated, agreed to and confirmed by the other companies. The portion of the lump sum that the Express Company agreed to pay the Atchison Company for the exclusive express facilities over all of the designated lines, taken as a whole, to be paid to the other named companies for services rendered by their respective roads, was a matter between them and the Atchison Company. It seems from the letter written by the president of the Atchison, Topeka & Santa Fé Railway Company to the president of the Express Company on the 20th day of February, 1896, that those amounts were arbitrarily fixed by the Atchison Company. But, however that may be, certain it is that the Express Company had nothing whatever to do with that matter. In entering into the contract, the Atchison Company acted for itself and on behalf of the other companies constituting the Santa Fé System, and those other constituent companies afterwards ratified its acts. The contract was plainly entire, providing for exclusive express facilities over the Atchison system of roads, in consideration of certain lump payments to be made to that company by the Express Company. Prior to the beginning of the services for which this action is brought, the contract had come to an end by the passing out of existence of the Atchison Company, and the refusal of its successor to adopt it. Full performance of it during the time involved in the action is not claimed, but it is contended on the part of the plain-

tiff that the defendant demanded and received of the Western Division of the Atlantic & Pacific Railroad Company the services called for by the contract sued on, and that, having done so, the Express Company should be estopped to deny that the Atlantic & Pacific Company should receive the same compensation therefor that was allowed it under the contract. Two answers to this contention readily suggest themselves: The first is that the Express Company never had anything to do with the proportion of the lump sum it contracted to pay the Atchison Company for the exclusive express facilities over the entire system of roads that should be awarded to the Atlantic & Pacific Company for its services as one of the constituent roads, the apportionment being a matter solely between the railroad companies; and, in the next place, the correspondence between the respective parties, upon which the case is in part submitted, clearly shows that the services involved in the action were not demanded or received by the defendant under and by virtue of the contract sued on, and upon the understanding that the Atlantic & Pacific Company was to receive therefor the same compensation that had been apportioned to it by the Atchison Company thereunder; but, on the contrary, it clearly appears from that correspondence that both parties to the suit well understood that it was at least claimed by the Express Company that the contract had been terminated, and that there was a disagreement between them as to what was a fair compensation for the services. A few extracts from the correspondence will make this perfectly plain. In the letter of January 30, 1896, from the president of the Atchison, Topeka & Santa Fé Railway Company to the president of the Express Company, the latter was informed by Mr. Ripley that the new Atchison Company was willing to operate on the terms of the contract in question, "so far as concerns its railroad and the companies embraced in its system. This, however, does not embrace the Colorado Midland, the Atlantic & Pacific, the St. Louis & San Francisco, the Manhattan, Alma & Burlingame, the St. Louis, Kansas City & Colorado, and the Wichita & Western; these roads being in the hands of receivers." Mr. Ripley proceeded to say that while the new Atchison Company "does not assume responsibility for the performance of the contract by the companies owning these lines, or the receivers operating them, it will continue for the present, with the consent of the receivers of these roads, to receive and distribute the monthly payment due to them under the contract; but it may become necessary for you [the president of the Express Company] hereafter to deal with them directly." In reply to that letter, the president of the Express Company wrote on the 24th of February, 1896, to Mr. Ripley in part, as follows:

"In view of your statement that the Atchison, Topeka & Santa Fé Ry. Co. would no longer be responsible for the performance of the contract formerly existing between it and Wells, Fargo & Company, so far as concerns the Colorado Midland, the Atlantic & Pacific, the St. Louis & San Francisco, the Manhattan, Alma & Burlingame, the St. Louis, Kansas City & Colorado, and the Wichita & Western Railroad Companies, but that said Santa Fé Railway Company was willing to continue to furnish express services on its own system, etc.: As advised, the contract referred to is terminated, and it may become necessary for me to negotiate directly with the companies mentioned above,

as to future services to be rendered by them. We therefore, while reserving all legal rights in the premises pending adjustment by a new agreement, will, for the month of February, and thereafter pending existing conditions, advance $109,000 per month to the Santa Fé Company, for itself and for the receiver companies you name, until 55% of monthly gross earnings be ascertained, and a final adjustment reached on that basis."

On the same day the president of the Express Company sent to the plaintiff herein, as receiver of the Atlantic & Pacific Company, a copy of that letter. This was followed by other letters to the plaintiff upon the question of compensation, in which it was urged that the condition of the traffic did not justify the rates that were paid, which were followed by a reply from the plaintiff to the president of the Express Company, of date July 7, 1896, which concluded as follows:

"Regarding a fair and equitable understanding between your company and the receiver of the Atlantic & Pacific Railroad Company which shall prevail during my receivership, I have this suggestion to make, to which I do not believe that you can consistently take exceptions. It is this: The contract now in effect between your company and the Atchison, Topeka & Santa Fé Railway Company is practically the same as the agreement that prevailed during the receivership of that company. Now, what we want—and I make the demand predicated upon what I believe is absolute justice—is that this road be allowed the same express revenue per month it will be entitled to when it becomes a part of the Atchison System, as it probably will within the next six or eight months. Can you say nay to this?"

In the letter of July 31, 1896, from the president of the Express Company to the plaintiff as receiver of the Atlantic & Pacific Company, he said:

"In directing our cashier to-day to forward you $9,000 for the month of July, I do so subject to my notice relative to the remittances for May and June; adding that I will either discuss the matter with you by letter later on, or see you in person. Of course, you understand that the rental to the Santa Fé Company remains excessive; and therefore, from our standpoint, you should not expect for the A. & P. the rate that we are compelled to pay the Santa Fé, or that we would under our Santa Fé contract. In other words, the rate paid that company is excessive, and there is no good reason why we should on that account pay so high a one to the Atlantic & Pacific."

Again, on December 28, 1896, the president of the Express Company wrote to the plaintiff, as receiver of the Atlantic & Pacific Company, as follows:

"Referring to sundry correspondence between us,—mine of July 1st, 10th, and 31st, yours of July 7th,—I have to say that for some years past we have in general divided the business for Central California between Pueblo and Oregon and the Albuquerque and Mojave routes, but in the spring and summer months of this year almost the entire tonnage happened to be sent by the Atlantic & Pacific; hence a larger portion had necessarily to be sent during the later months via Ogden, and the earnings to A. & P. are and will be consequently appreciably less. Therefore, from and after December 1st, 1896, we will remit as an advance payment $7,000 per month. The business strictly local to the line (that is to say, business pertaining to points on the line) does not exceed 8 per cent. of the entire tonnage, so that for every dollar which must absolutely pass over the A. & P. line there are $12 of divertible business. Flanked on both sides as the Atlantic & Pacific road is by the highways from Ogden and Deming, we are justified in asking just terms. Moreover, the great damage by fire we have suffered for years past has almost all occurred on the Atlantic & Pacific lines, because of defective cars, tracks, inferior coal, etc. These are merely some of the reasons for asking and expecting a moderate percentage rate,—certainly not to exceed 50 per cent."

On January 30, 1897, the president of the Express Company wrote to the plaintiff, as receiver of the Atlantic & Pacific Company, as follows:

"Referring to my letter of December 28th, 1896, and to our discussion of matters of mutual interest between the Atlantic & Pacific and Wells, Fargo & Co. in my office the 13th inst., and confirming my former remarks: I find by reference to the matter that at 50 per cent. we have up to December 31st probably overpaid the A. & P. some $7,000, approximately. Hence we will not make any remittance for the present month of January, as the aggregate amount already paid the road from May to December inclusive, $70,000, will probably be 50 per cent. of the business transacted thereon for nine months, from May 1st, 1896, to January 31st, 1897,—the present month estimated."

To the last-mentioned letter the receiver of the Atlantic & Pacific Company replied on February 9, 1897, calling attention to an order made by the judge of the United States court for the territory of New Mexico on the 1st day of June, 1895, in the suit of the Mercantile Trust Company against the Atlantic & Pacific Railroad Company et al., authorizing the receivers therein appointed to unite with the receivers of the Atchison, Topeka & Santa Fé Railroad Company, and with the other constituent companies of the Santa Fé System, in carrying out the modified agreement of May 22, 1895, and authorizing the receivers of the Atlantic & Pacific Railroad Company "to make such agreement or contract with Wells, Fargo and Company as may be agreed upon by the receivers of the Atchison, Topeka and Santa Fé Railroad Company, the receivers of the St. Louis and San Francisco Railway Company, and other auxiliary railroad companies of the Atchison, Topeka and Santa Fé Railroad System." The letter last mentioned closed with the statement that, "as the contract in question with your company has never been disaffirmed by either my predecessors or by myself, the agreement must necessarily be considered as being still in full force and effect, and in our settlement with your company we cannot recognize any statements of accounts emanating from your office or from your accounting department that are not made up strictly in accordance with the contract that was in force when the above decree was promulgated by the court." To this letter of the receiver of the Atlantic & Pacific Company, the president of the Express Company replied, under date of February 27, 1897, as follows:

"The last original contract between Wells, Fargo & Company and the Santa Fé System (previous to the existing one of May, 1896) was made by that company, representing itself and controlled roads; including, among others, the Atlantic & Pacific. When the Santa Fé Company went into the hands of receivers, an application was made to Judge Caldwell to modify that contract, and an order was made to that effect, which is referred to in the copy of an order subsequently made by Judge Collier, and set forth in your letter. By virtue of the authority given by Judge Caldwell, the receivers of the Santa Fé Company modified that original contract; their action was approved by Judge Collier; and it is that proceeding which is invoked by you as authority for claiming compensation as provided for in the modified contract. But, after the Santa Fé System was reorganized and the receivers discharged, the president of that company gave notice that the Santa Fé R. R. Co. would no longer be responsible for the enforcement of that modified contract, and suggested that Wells, Fargo & Company should make arrangements severally with the controlled and auxiliary roads included in the former modified contract. The president of the Santa Fé having announced that his company would no longer

be responsible for the performance of the original contract as modified, Wells, Fargo & Company made separate arrangements with that company and several others of the former Santa Fé System for express facilities. I. submit that the former existing arrangement was discontinued by the Santa Fé and other contracting parties; that the contract was an entirety, and became ineffectual whenever any company composing the system was eliminated from it, and was not held bound by the terms thereof. It was upon this theory that Judge Caldwell finally announced, at St. Paul, that he would not undertake to enforce the original contract against Wells, Fargo & Company, but authorized the receivers to enter into a modified contract. Now, that modified arrangement was made with the receivers of the Santa Fé Company, and lasted during the time of the receivership, but did not, it would seem, bind the Santa Fé Company as reorganized and relieved from the receivership. At least, this appears to have been the view taken by President Ripley, and to explain his action in the premises as the official representative of that company. Hence your theory that the ruling of the court upon a contract that expired of itself, because of the noncohesion of the original parties thereto, and because of the radical change of organization in the party of the first part, is still binding as between the Atlantic & Pacific Railroad and this company, seems not to have a reasonable foundation. Our auditor will remit you $7,000 for the month of February, as approximating the earnings of the line at 50%, which is a fair and reasonable rental, as shown in mine of January 30th."

There was a little more correspondence between the respective parties, of a similar nature. This correspondence, so far from showing that the Express Company demanded and received the services covered by the suit, under the contract of December 1, 1892, as modified by that of May 22, 1895, shows that it contended throughout the period here involved that the contract was at an end, and that it was not willing to pay for the services rendered by the Atlantic & Pacific Company the amount apportioned to it by the Atchison Company under the contract. I think it clear that the plaintiff has mistaken his remedy, and that the present suit, which is upon the contract, cannot be maintained. An order will be entered sustaining the demurrer to the amended complaint.